NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 220445-U

NO. 4-22-0445

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 27, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* C.T., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazewell County |
| Petitioner-Appellee, | ) | No. 21JA20 |
| v. | ) | |
| Zack T., | ) | Honorable |
| Respondent-Appellant). | ) | David A. Brown, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Harris and Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The appellate court affirmed the trial court's dispositional order finding
respondent unfit and making the minor a ward of the court because those findings
were not against the manifest weight of the evidence.

¶ 2    Respondent, Zack T., is the father of C.T. (born March 2016). In March 2021, the

State filed a petition for adjudication of wardship, alleging C.T. was a neglected minor in that he

lived in an environment injurious to his welfare when living with respondent and Savanah T.,

C.T.'s mother, because (1) Savanah had unresolved issues of domestic violence and substance

abuse, (2) respondent was aware of the domestic violence and substance abuse problems and

continued to live with Savanah, and (3) the minor was exposed to domestic violence. See 705

ILCS 405/2-3(1)(b) (West 2020). In January 2022, the trial court adjudicated C.T. a neglected

minor.

¶ 3    In May 2022, the trial court conducted a dispositional hearing, adjudicated the

minor a ward of the court, and placed guardianship of the child with the guardianship administrator of the Department of Children and Family Services (DCFS).

¶ 4    Respondent appeals, arguing that the trial court's dispositional order finding respondent unfit and making C.T. a ward of the court was against the manifest weight of the evidence. We disagree and affirm.

¶ 5                I. BACKGROUND

¶ 6                A. The Petition

¶ 7    In January 2021, the State filed a petition for adjudication of wardship requesting C.T. be adjudicated a neglected minor and made a ward of the court. The petition alleged that C.T. lived in an environment injurious to his welfare because Savanah had unresolved issues of substance abuse and domestic violence. Specifically, the petition asserted that in September 2020, Savanah was intoxicated and struck respondent while respondent was holding C.T. The petition further detailed Savanah's history of driving under the influence convictions. Regarding respondent, the petition alleged that respondent was aware of Savanah's unresolved issues and continued to reside with C.T. in the same home as Savanah.

¶ 8    In March 2021, the State filed an amended petition that was substantially similar to the initial petition but (1) alleged a new incident of domestic violence and (2) requested temporary custody and guardianship of C.T. The amended petition alleged that respondent left C.T. in Savanah's care on the afternoon of March 22, 2021, and did not return until the next day. When respondent returned, he found Savanah was intoxicated, and she struck respondent in the face.

¶ 9    On the same day the amended petition was filed, the trial court conducted a shelter care hearing and placed temporary custody and guardianship with the guardianship

administrator of DCFS.

¶ 10 We note that respondent filed some procedural motions, which the court addressed, and the case was continued on a few occasions at respondent's request.

¶ 11 B. The Adjudicatory Hearing

¶ 12 In January 2022, the trial court conducted an adjudicatory hearing. Respondent stipulated that C.T. was a neglected minor and, as a factual basis, agreed the State would call witnesses who would testify that (1) respondent continued to reside with the minor and Savanah in the home despite his awareness of her substance abuse and domestic violence issues and (2) he left C.T. in Savanah's care from March 22 to March 23, 2022, and (3) when he returned home, Savanah was intoxicated and struck respondent in the face. The court accepted the stipulation and factual basis and adjudicated C.T. a neglected minor.

¶ 13 C. The Dispositional Hearing

¶ 14 In May 2022, the trial court conducted a dispositional hearing.

¶ 15 1. *The State's Evidence*

¶ 16 The State first presented the dispositional report written by Jennifer Walker. Walker then testified that she worked for Lutheran Social Services and was the caseworker assigned to C.T.'s case. Walker stated that respondent had three supervised visits a week with C.T., which took place at respondent's home. The visits went well, and C.T. was very bonded to respondent. Walker had no concerns about the visits and believed respondent could safely have unsupervised visits with C.T.

¶ 17 Walker further testified that her only concern, and only recommended service, was domestic violence treatment. Walker explained that respondent had completed parenting classes and voluntarily engaged in individual mental health counseling for several months but

stopped because he could no longer afford them. Respondent had 50% custody of two daughters from a different relationship, and Walker opined that respondent had demonstrated he was able to be an adequate parent, maintain employment, and manage his schedule to comply with all of his obligations.

¶ 18   Walker acknowledged that, as far as she knew, respondent had not spoken with Savanah for over a year and was no longer living with her. Walker also acknowledged that respondent was the victim of domestic violence and not a perpetrator. However, Walker was concerned that without domestic violence services, respondent would enter into another abusive relationship. Walker explained that respondent was reluctant to cooperate with her in the absence of a court order and was frequently standoffish. Respondent insisted he did not need domestic violence services and was not in a relationship with anyone. However, Walker did not believe respondent because (1) when she asked if he was seeing someone, respondent would not give a straightforward answer and (2) Walker had heard certain things from respondent's daughter that suggested he was, in fact, in a new relationship.

¶ 19   Walker testified that she found this lack of honesty unsettling. She explained that she was worried that respondent lacked the skills to recognize when he was in a problematic relationship or identify issues in a relationship to prevent it from becoming abusive. Walker was concerned C.T. would be exposed to domestic violence, which would be against his best interest. And given the reasons C.T. came into care, the only way Walker could be confident that C.T. would be safe to return was if respondent completed domestic violence services.

¶ 20                    2. *Defendant's Evidence*

¶ 21   Benjamin Henderson testified that he was an associate pastor at a community church that respondent attended. Henderson supervised one of respondent's weekly visits with

- 4 -

C.T. He described the visits in some detail and noted respondent had always shown that he was loving, nurturing, supportive, and deeply bonded with C.T. Henderson testified that respondent (1) never missed a visit (with the exception of a few that were cancelled due to snowstorms), (2) C.T. was always excited to see respondent, and (3) the family "kind of click[ed]" in a very natural way. Henderson acknowledged that he did not know respondent before Henderson began supervising visits and he did not interact individually with respondent outside of supervised visits.

¶ 22                        3. *The Guardian Ad Litem's Witness*

¶ 23        The guardian *ad litem* (GAL) called Shandra Ghent, C.T.'s foster mother, to testify. C.T. had lived with Ghent since he was taken into care in March 2021. Ghent agreed with Walker that she had reason to believe that respondent was in a relationship, although she did not have firsthand knowledge. Ghent also agreed that she had no concerns about respondent safely supervising and parenting C.T. However, Ghent testified that she had a very "contentious" relationship with respondent, which she attributed to his aggressiveness, distrust, threatening manner of communication, and poor character. Ghent acknowledged she did not remember the last time she had communicated with respondent other than at a "child/family team meeting."

¶ 24                        4. *Arguments of the Parties*

¶ 25        The State and GAL argued that respondent's refusal to cooperate with his caseworker and his refusal to be forthcoming about his relationship status demonstrated that he had not corrected the conditions that necessitated C.T.'s coming into care. Specifically, they noted that respondent (1) continued to live with Savanah while knowing that she had substance abuse problems, (2) had been attacked by Savanah in front of C.T., and (3) left C.T. with Savanah as his sole-caretaker overnight. The State and GAL explained that children were greatly

harmed by merely witnessing domestic violence and substance abuse, even if they were not the victims. Accordingly, they argued respondent was an unfit parent until he completed domestic violence services. Without those services, respondent would not be able to leave a relationship before C.T. would be exposed to domestic violence. The State and GAL noted that respondent's standoffishness and lack of cooperation, although not relevant to his ability to parent C.T., reinforced their concern that respondent had not learned enough to avoid entering an abusive relationship in the future.

¶ 26        Respondent argued that all parties agreed that respondent was fully capable of parenting C.T. and had demonstrated this capability by having (1) consistently positive visits with C.T. and (2) 50% custody of two other children. Respondent also noted that he had engaged in parenting classes and individual counseling. He asserted that the counseling focused on his prior abusive relationships and that he voluntarily attended counseling before the court had ordered it. Because respondent had not lived with or spoken to Savanah in over a year, he argued that he had corrected the conditions that required the case to be opened. Respondent further asserted that (1) he was not in a relationship with anyone and (2) he was willing to engage in domestic violence services. Respondent requested the court find him fit and place custody of C.T. with him.

¶ 27                        5. *The Trial Court's Findings*

¶ 28        The trial court found that (1) it was in C.T.'s best interest that he be made a ward of the court and (2) respondent was unfit for reasons other than financial circumstances alone to care for, protect, train, educate, supervise, or discipline C.T. and it would be contrary to C.T.'s health, safety, and best interest to be in respondent's custody. The court echoed the sentiments of the State and GAL that merely discontinuing contact with Savanah was not enough to ensure

C.T.'s safety. The court explained in detail to respondent that "there's plenty of evidence that children exposed to domestic violence, there's repercussions. There are bad consequences."

¶ 29　　　　The trial court noted that it did not matter whether respondent was the victim or perpetrator because children learn how to treat others and what an appropriate relationship with another looks like from their parents' examples. The court emphasized that respondent needed domestic violence services so he could understand why he ended up in abusive relationships in the past and avoid them in the future.

¶ 30　　　　Because the attorneys had all spoken indirectly about respondent's demeanor and communication style, the trial court also addressed, at some length, respondent's "personality" and "enthusiasm" about his children. The court noted that although it personally enjoyed respondent's "big personalit[y]" and willingness to "debate[,]" others might take his demeanor the wrong way, stating "I would hope that you would appreciate *** that your what I'll say enthusiasm isn't accepted as enthusiasm all the time, all right?" Respondent stated, "I would agree." The court then explained that (1) many people would "withdraw" or "pull back" to C.T.'s detriment and (2) respondent needed to learn how to adjust his tone depending on the audience so he "[did not] turn people off."

¶ 31　　　　The trial court entered a written order finding that it was in the best interest of C.T. and the public that the minor be made a ward of the court and adjudicated a neglected minor. The court placed guardianship and custody with the guardianship administrator of DCFS.

¶ 32　　　　This appeal followed.

¶ 33　　　　　　　　　　　　　II. ANALYSIS

¶ 34　　　　Respondent appeals, arguing that the trial court's dispositional order finding respondent unfit and making C.T. a ward of the court was against the manifest weight of the

evidence. We disagree and affirm.

¶ 35                              A. The Law

¶ 36          The Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2020))

provides a systematic framework for determining when a minor can be removed from his or her

parents and made a ward of the State. *In re A.P.*, 2012 IL 113875, ¶ 18, 981 N.E.2d 336. A trial

court must make a finding of abuse, neglect, or dependence regarding a minor before it can

adjudicate the minor a ward of the court. 705 ILCS 405/2-10 (West 2020). If a trial court finds a

minor is neglected, then the court holds a dispositional hearing at which the "court determines

whether it is consistent with the health, safety and best interests of the minor and the public that

the minor be made a ward of the court." *A.P.*, 2012 IL 113875, ¶ 21. Section 2-27(1) of the Act

provides as follows:

> "If the court determines and puts in writing the factual basis supporting the
>
> determination of whether the parents *** of a minor adjudged a ward of the court
>
> are unfit or are unable, for some reason other than financial circumstances alone,
>
> to care for, protect, train or discipline the minor or are unwilling to do so, and that
>
> the health, safety, and best interest of the minor will be jeopardized if the minor
>
> remains in the custody of his or her parents ***, the court may [remove the minor
>
> from a parent's custody.]" 705 ILCS 405/2-27(1) (West 2020).

¶ 37          The trial court may make four basic types of dispositional orders with respect to a

ward of the court. *In re M.M.*, 2016 IL 119932, ¶ 18, 72 N.E.3d 260. "The minor may be

(1) continued in the care of the minor's parent, guardian, or legal custodian; (2) restored to the

custody of the minor's parent, guardian, or legal custodian; (3) ordered partially or completely

emancipated; or (4) 'placed in accordance' with section 2-27 of the Act." *Id.* (quoting 705 ILCS

405/2-23(1) (West 2012)).

¶ 38     The rules of evidence do not apply at dispositional hearings, and the trial court is free to consider anything that it finds helpful to make an appropriate disposition. *In re A.L.*, 409 Ill. App. 3d 492, 502-03, 949 N.E.2d 1123, 1131 (2011); 705 ILCS 405/2-22(1) (West 2020). A trial court's ruling at a dispositional hearing "will be reversed only if the findings of fact are against the manifest weight of the evidence." *In re J.W.*, 386 Ill. App. 3d 847, 856, 898 N.E.2d 803, 811 (2008). A finding is against the manifest weight of the evidence if the opposite result is clearly proper. *In re Audrey B.*, 2015 IL App (1st) 142909, ¶ 32, 31 N.E.3d 892. When reviewing a trial court's judgment under the manifest weight of the evidence standard, a reviewing court will not substitute its judgment for that of the trial court on matters of witness credibility, the weight to be given to the evidence, and inferences to be drawn from the evidence. *In re Parentage of W.J.B.*, 2016 IL App (2d) 140361, ¶ 25, 68 N.E.3d 977.

¶ 39                    B. This Case

¶ 40     Respondent argues the trial court's finding was against the manifest weight of the evidence because (1) the uncontroverted evidence showed he had a strong bond with C.T. and could safely care for him, (2) contrary to the court's conclusion that he failed to protect C.T. from being exposed to domestic violence, respondent had acted appropriately by removing C.T. from the home when Savanah was intoxicated and violent, (3) he had no contact with Savanah in over a year and therefore eliminated any safety concerns, and (4) the court improperly considered respondent's personality and "enthusiasm" for his children as a basis for the unfitness findings.

¶ 41     Given our deferential standard of review, we conclude that the trial court's dispositional order finding respondent unfit was not against the manifest weight of the evidence.

The trial court was free to consider any information it found helpful to make its determination at the dispositional hearing. The court's finding was based on its concerns about respondent's *future* relationships not any past domestic violence with Savanah. The court explained that although respondent was the victim instead of the perpetrator, domestic violence treatment was still important to protect C.T. from being exposed to it in the future. Respondent needed to understand why he was attracted to people who were physically violent toward him and why he stayed in such a relationship despite the abuse and danger to C.T.

¶ 42        Further, the trial court credited the testimony it heard that respondent was likely in a new relationship and refused to be forthright with Walker about it when asked. The court was free to infer that respondent would not disclose his relationship status in the future or whether he was the victim of domestic violence. This inference is particularly supported when combined with respondent's telling Walker he did not believe he needed domestic violence services. Given the reasons C.T. came into care—namely, respondent left C.T. alone with Savanah overnight despite DCFS having an intact plan due to her substance abuse and domestic violence issues— we conclude that the trial court's finding that respondent was unfit was not against the manifest weight of the evidence.

¶ 43        Regarding the trial court's discussion of respondent's personality, our review of the record demonstrates that the court was not holding respondent's personality against him or as a basis for determining fitness. We note that (1) the trial court expressly stated that it personally *liked* respondent's outspoken personality, (2) respondent agreed with the court that others could take his "enthusiasm" the wrong way when communicating with him, and (3) the trial court emphasized that its discussion was unrelated to the unfitness proceedings. The court addressed the issue only because the parties' attorneys did so in their arguments, and it was merely

attempting to be thorough and helpful to respondent by having an explicit, rather than implicit, discussion.

¶ 44      In closing, we recognize all of the positive steps respondent had taken prior to the dispositional hearing. Like the parties and the trial court, we agree that all the evidence suggests respondent cares deeply about C.T. and there are no concerns, in general, about respondent's ability to be a loving, dedicated parent. Respondent voluntarily engaged in services before he was required to and was able to separate himself from Savanah, something that this court has recognized can be extremely difficult. See *In re J.B.*, 2019 IL App (4th) 190537, ¶¶ 26, 40, 147 N.E.3d 953 (highlighting the "tremendous amounts of work" done by the domestic violence victim in that case to gain financial and emotional independence from her abuser). Had respondent immediately engaged in domestic violence services the same way he engaged in counseling and parenting classes, the outcome in this case may well have been different. But that is not the case before us, and the record demonstrates that the trial court's ruling was not against the manifest weight of the evidence.

¶ 45                                    III. CONCLUSION

¶ 46      For the reasons stated, we affirm the trial court's judgment.

¶ 47      Affirmed.